Layton v. Hough.

DOUGLAS Y. LAYTON, Executor, Appellant v. WARWICK M. HOUGH, Assignee, Respondent.

St. Louis Court of Appeals. Argued and Submitted November 14, 1912. Opinion Filed December 14, 1912.

1. **BUILDING AND LOAN ASSOCIATIONS: Assignments for Benefit of Creditors: Equitable Proceedings.** While, under the law as it stood prior to the enactment of section 3420, Revised Statutes 1909, a building and loan association could make an assignment for the benefit of creditors, nevertheless the courts did not treat the proceeding as purely statutory but applied equitable principles in undertaking the settlement of questions arising between a note-making member and the company or its assignee, and practically treated the assignee as a receiver appointed by a court of equity.

2. **LACHES: Assignments for Benefit of Creditors: Failure to Assert Claim: Building and Loan Associations.** A purchaser of notes executed by stockholders of a domestic building and loan association to the association, who permitted the assignee for the benefit of creditors of the association to distribute the bulk of the estate to stockholders whose claims had been allowed and who were recognized by the court as entitled to the estate, without presenting any claim to a distributive share, based on his claim that, by virtue of having purchased the notes, he became the owner of the stock pledged by the makers of the notes as collateral security, was guilty of laches, barring his right to dividends, even if, otherwise, he was entitled to them.

3. **BUILDING AND LOAN ASSOCIATIONS: Nature: Partnership.** A building and loan association which is conducted entirely on the mutual plan is in the nature of a co-operative association, and its stockholders are members, not only in the usual sense of stockholders, but are also partners of each other.

4. ———: **Sale of Note: Right of Indorsee to Collateral: Bills and Notes.** Under the law merchant, the purchase of a note,

Layton v. Hough.

either negotiable or non-negotiable, carries with it its collateral; but this is not true of a note executed to a building and loan association by one of its stockholders.

5. ————: Non-negotiable Note: Bills and Notes. A note executed to a building and loan association by one of its stockholders, in which the maker promises to carry the stock until the loan is fully paid, "with all the penalties on said stock, according to the by-laws and prospectus of the company," is a non-negotiable note.

6. ————: Assignability of Notes: Bills and Notes. The word "non-negotiable" in section 3392, Revised Statutes 1909, providing that, for every loan made by a building and loan association, a non-negotiable note, secured by a first mortgage on real estate, shall be given, accompanied by a transfer of the stock of the member, means "non-assignable," and hence, except in the event of liquidation, when they go to the official liquidator, such notes are not assignable either by the association or by its assignee for the benefit of creditors.

7. ————: Assignments for Benefit of Creditors: Sale of Note by Assignee: Right of Purchaser to Collateral. A transfer, by the assignee for the benefit of creditors of a building and loan association, of past-due notes, payable to the association and executed by its stockholders, does not pass title to the stock of such stockholders, pledged as collateral.

8. ————: ————: ————: Past-due Note: Rights of Purchaser Concerning Collateral. Where stockholders of a building and loan association who had executed notes to the association would not have been entitled to dividends declared in proceedings under an assignment for the benefit of the creditors of the association, if the notes had not been sold by the assignee, the purchaser of the notes after maturity and default, who, under the law, took them subject to all equities, obtained no better rights than the stockholders had, and hence would not be entitled to dividends on the stock, even if it were true that the purchase of the notes operated to transfer the stock.

9. BILLS AND NOTES: Purchase of Past-due Note: Purchaser Takes Subject to Equities. One who purchases a note after it is past due, takes it subject to all equities against it.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

AFFIRMED.

*William E. Baird* for appellant.

(1) The transfer of a note, in the absence of an express reservation, carries with it the security and entitles the transferee to all its benefits. Anderson v. Baumgarten, 27 Mo. 87; Johnson v. Johnson, 81 Mo. 331; Hagerman v. Sutton, 91 Mo. 531; Bank v. Grewe, 84 Mo. 477; Trust Co. v. Smythe, 94 Tenn. 513; Brewing Co. v. Manasse, 99 Wis. 99. (2) This is true although the transferee at the time of transfer was ignorant of the existence of any security. Cases cited above; Bank v. Libby, 101 Wis. 193. (3) This is a statutory proceeding at law, not an equitable action, and therefore the principles regulating the marshaling of estates have no application. Lock & Stopper Co. v. Bowman, 84 Mo. App. 478; In re Heath's Assignment, 136 Mo. App. 352.

*Warwick Hough* for respondent.

(1) The motion in this case is not a pleading within the meaning of the statute, and cannot be demurred to, or otherwise pleaded to, but is subject to any defense, legal or equitable. Graff v. Dougherty, 139 Mo. App. 56. (2) A building and loan association is a copartnership with corporate rights, and the rights of all stockholders are to be determined upon equitable principles. Reitz v. Hayward, 100 Mo. App. 226. Christian's Appeal, 102 Pa. St. 184. Brown v. Archer, 62 Mo. App. 292. Woerheide v. Johnston, 81 Mo. App. 197. Endlich on B. & L. Ass'ns, 366 and 547. (3) The usual method of administering assets of insolvent building associations is through a receiver, but an assignment is equally efficacious, when not prohibited by statute. Woerheide v. Johnston, 81 Mo. App. 193; Christian's Appeal, 102 Pa. St. 184. The assignment in this case was valid when made; but such assignments are now prohibited by statute. Sec. 3420, R. S. 1909.

(4)    The rule of the law merchant applicable to the ordinary sale or transfer of negotiable paper secured by collateral, is not applicable to the notes of borrowing stockholders in a building and loan association. Sappington v. Loan Co., 76 Mo. App. 242. (5) A building and loan association which is a going concern has no power to sell the note of a borrowing stockholder, and such sale is a nullity and confers no rights on the purchaser. Lovelace v. Pratt, 163 Mo. 70; Cobe v. Lovan, 193 Mo. 249. (6) The sale of the unpaid stockholders' notes to McCormack, as uncollectible assets, under the order of the court, gave him no greater rights than the borrowing stockholders, whose notes he purchased, themselves had in the assets of the insolvent corporation. Sappington v. Loan Co., 76 Mo. App. 242. (7) What McCormack paid the assignee for the notes, will be treated in equity as a payment by the borrower on the notes to the association. (8) It is admitted in the agreed statement that none of the claimants, whose notes McCormack purchased, would have been entitled to a dividend if the notes had not been sold. If Mc-Cormack is entitled to any dividend, then the stockholders who received the whole of the 18 per cent have received more than they were entitled to, and they are necessary parties to this proceeding and cannot be adjudged to refund without notice and a hearing. (9) The commissioner and the court having approved the action of the assignee in paying the whole of the 18 per cent dividend to stockholders other than those whose notes McCormack purchased, without objection or exception, McCormack is concluded thereby.

STATEMENT.—The Farmers & Mechanics Savings Company was incorporated under the laws of this State relating to building and loan associations in force February, 1891. [See Revised Statutes, 1889, article 9, chapter 42.] Its original home was at Springfield in

this State but in October, 1897, it amended and refiled its articles of association and transferred its headquarters to the city of St. Louis. It had increased its capital stock August 18, 1895, filing amended articles to that end. On the 6th of May, 1899, under the provisions of sections 434 and following, in chapter 8, Revised Statutes 1889, it made a general assignment for the benefit of its creditors, Warwick M. Hough being named as assignee. As far as concerns this case these provisions are identical with chapter 2, sections 323 and following, Revised Statutes 1899, and with the provisions of sections 896 and following, in chapter 8, Revised Statutes 1909. The law pertaining to the incorporation of building and loan associations was amended in several particulars by the Act of March 26, 1901 (Laws 1901, page 93), one of the material changes made by that Act and now embodied in section 3420, Revised Statutes 1909, providing that it shall thereafter be unlawful for any such association to make a voluntary general assignment of its business and affairs. This statutory prohibition does not apply to this assignment.

On December 21, 1908, there were nine notes among the assets of the association, the aggregate amount due on which was $1528.40, these being the notes subsequently sold to appellant's testator, G. W. McCormack, as will hereafter be stated. All of these notes, dated in 1892, 1893, 1894 and 1895, while varying in amount, were substantially thus: The makers, at so many months after date promised to pay the Farmers & Mechanics Savings Company, an amount specified, "for value received, with interest from date at the rate of six per cent per annum, payable in monthly installments on the fourth Saturday of each month, and we promise to pay said company sixty monthly dues of $5 each month as stockholder in said company upon five (or whatever the number might be) shares of stock (which I agree to carry until this loan is fully paid),

with all penalties on said stock, according to the by-laws and prospectus of said company. I further agree to pay said company the sum of $4 (or whatever the amount of premium might be) each month for sixty months, being the premium paid by me for this loan." Along with the note the makers gave deeds of trust to a trustee named for the benefit of the Farmers & Mechanics Savings Company, in which deeds it is recited that the makers convey to the trustee the real estate described, as also the certificate described for so many shares of stock in the Farmers & Mechanics Savings Company. it being recited in the deed of trust that "possession of same premises and said shares of stock, now deliver unto the said party of the second part," the condition being the payment of notes above referred to. Otherwise they are in the usual form of deeds of trust. On the date last above mentioned, that is December 21, the trustee applied to the judge of the circuit court, before whom the proceedings under the assignment were being conducted, for authority to sell the remnant of the assigned estate then in his hands, among others the notes mentioned, as to which notes he· reported that he had not been able to convert them into cash. The petition also prayed for leave to sell the "real estate" secured by these notes. While the petition mentioned the notes and prayed for an order of sale as to them and of the real estate covered by the deeds of trust, and asks for a sale of the notes and of the real estate, no reference whatever is made to the shares of stock, which were also held as collateral, the language of the petition being for authority "to sell the property both real and personal, hereinabove described, at public auction," the property described being the notes and real estate. The trustee gave notice of the proposed sale, describing the notes and real estate alone, and at that sale, held February 1, 1909, G. W. McCormack, testator of the appellant Layton, bought in the notes and the real estate. The sale was

reported by the assignee February 5, 1909, and being approved by the court on February 9, 1909, the assignee was ordered to convey and transfer the real estate and notes to McCormack. It is agreed that the assignee did on March 22, 1909, deliver the notes and deeds of trust covering the real estate described, and executed a bill of sale to McCormack, in which the notes alone are described, the bill of sale reciting that the assignee "does hereby sell, assign and transfer unto the said George W. McCormack and his assigns, all right, title and interest whatsoever which is vested in the said Warwick M. Hough as such assignee by virtue of said deed of assignment, and by virtue of the aforesaid proceedings in the circuit court." No mention of the shares of stock is made in the bill of sale or in any of the orders of the court. Following this, on April 16, the assignee applied for an order for payment of a dividend upon allowed claims and for an allowance for his services and those of his attorney. The assignee reported that he then had a cash balance on hand amounting to $4452.95. The application of the assignee was granted, a certain sum being allowed him for his services and those of his attorney, another sum being set aside to defray the expenses of paying the dividend, leaving a balance to be distributed to the stock creditors in the amount of $2921.25. The report showed allowances on the claims of eighty-nine stockholders as payments on their stock, amounting to upwards of $2700. Of these eighty-nine stockholders only fifty-four, having claims aggregating $16,508.85, had either paid their loans in full or the dividends on their claims were in excess of their loans, and they received dividends accordingly, the dividend declared being 18 per cent. None of the stockholders whose notes had been purchased by McCormack were included in this, and any claims which the stockholders, whose notes had been purchased by Mr. McCormack might have, were neither then nor at any other time reported by the assignee as

"allowed claims;" nor were any of them allowed by the court. The above matters appear by the agreed statement of facts in the case. That agreement further sets out that a dividend of 18 per cent on these claims or shares which McCormack claimed he had purchased would be $544.58. It is further set out in this agreed statement, and referring to these claims, that "in none of the cases would the dividend be in excess of the loans and none of the claimants (shareholders and note makers under whom McCormack claimed, as we understand) would have been entitled to a dividend if the notes had not been sold. If those claims upon which Mr. McCormack claims a dividend, amounting to $3026, were included, a dividend of 18 per cent upon all claims would have amounted to $3516.27, whereas only $2921.25 was set apart for the payment of the dividend.

The order for the payment of the dividend of 18 per cent is: "Assignee ordered to pay a dividend of 18 per cent on all allowed claims except upon the claims of stockholders who are indebted to the company upon unpaid loans." This dividend, it is agreed, was paid by the assignee on the 22nd of April, 1909. After this dividend had been paid the assignee had a cash balance on hand amounting to $235.77, reserved to pay the allowance to the comissioner and final court costs. On July 2, 1909, the assignee made a supplemental report showing that this dividend had been paid on April 22 and also giving a list of the stockholders on whose claims the dividend had then been paid, with the amount paid to each. This list of stockholders did not include any of those whose shares McCormack claimed he had purchased and whose notes he had bought. This report was duly filed in court and no exceptions were ever filed to it by anyone, so far as anything appears to the contrary.

Mr. McCormack first presented his demand that dividends should be declared and paid to him on the

stock, in a petition which he filed July 21, 1909. On
the 24th of September of that year he withdrew this
petition and on the same day filed a motion for judg-
ment against the assignee as provided by what is now
section 929, R. S. 1909, or what was section 457, R. S.
1889. In this motion for judgment it is set out, among
other things, that the assignee, pursuant to the order
of the court, had offered for sale certain assets of the
estate of which McCormack became purchaser and
which sale was duly approved by the court and that
the assignee had thereupon delivered to him a bill of
sale; that among the property sold to him (McCor-
mack) were the promissory notes above referred to. It
is further stated that the makers of these notes were
stockholders in the Farmers & Mechanics Savings Com-
pany; that each of the notes was secured by a deed of
trust upon real estate and by the pledge of certain
shares of stock in the company owned by the respective
makers of the notes. It sets out the particulars of the
notes and the number of shares pledged with each, and
states that after the sale the assignee had declared a
dividend of 18 per cent upon all claims allowed, "ex-
cept the claims of stockholders who were indebted to
the estate, and the amounts to which your petitioner is
entitled to as dividends upon said stock are as fol-
lows:" Setting out this amount to be $561.60, it is
averred that neither the petitioner, McCormack, nor
the makers of the notes were, at the time the dividend
was declared, nor are they now, indebted to the com-
pany or estate; and that on July 16, 1909, the petition-
er, McCormack, demanded the dividends of the as-
signee but the assignee had "refused and refuses to
pay the same or any part thereof," wherefore he asks
judgment against the assignee for the above named
sum. On a hearing of this motion it was denied by the
court, the cause being heard before the court on the
agreed statement of facts above referred to and on oral
testimony; the assignee producing testimony to the ef-

fect that he had never intended to sell the stock along with the notes; that McCormack knew of this, had actual knowledge of it and had bought with that understanding; the testimony on the part of Mr. McCormack being that he had no knowledge or understanding one way or the other about it, but supposed that the sale of the notes carried the stock. On the motion being overruled and a motion for a new trial on that filed, overruled and exceptions saved, Mr. McCormack duly perfected appeal to this court. His death having been suggested after the appeal, the cause was revived in the name of his executor.

REYNOLDS, P. J. (after stating the facts).—The claim of the executor of Mr. McCormack is, that having purchased these notes, he had acquired their collateral, the stock, and that that purchase carried with it the right to any dividend which had been declared in favor of stockholders, here 18 per cent. The assignee claims that he never pretended or intended to sell the shares of stock to Mr. McCormack; that he never did sell them; that he had no power to do so, and that Mr. McCormack is charged with notice of the law, which the assignee claims is that the purchase of these notes did not carry with it the stock. He further claims that appellant is barred by the laches of his testator and that to now compel him to pay an amount largely in excess of funds in his hands as assignee, he having paid out the 18 per cent dividend on the allowed claims, stock and otherwise, would be inequitable.

While the important point for consideration here is whether the stock certificates evidencing membership in the company, pledged as collateral to the notes, passed to Mr. McCormack by purchase of those notes, there are other questions presented which demand some attention. Thus, lack of diligence on the part of Mr. McCormack in presenting his claim; failure to take any ex-

ception or appeal from the action of the assignee in excluding these claims from his report (see sections 447, 448, R. S. 1889; 918, 919, R. S. 1909) or to the order of the court for payment of dividends, from which order the makers of the notes which he bought were excluded. A defect of parties is also urged, it being claimed by the assignee that to reopen the order for payment of the 18 per cent dividend would require either that the assignee pay claimant out of his own funds, or that those who had been paid the 18 per cent dividend under order of court would be required to refund, as, with the McCormack claim included, 18 per cent could not be paid.

It is urged by counsel for appellant that this is purely a statutory proceeding and not in equity, and that it does not involve marshaling of assets or the adjustment of the claims of creditors. Two decisions are relied upon for this. One is Universal Lock & Stopper Co., Bowman, Assignee, v. Blake & Johnson, 84 Mo. App. 478. In that case, it is true, this court treats a proceeding under section 356, R. S. 1899, now section 929, R. S. 1909, as entirely statutory. It is to be said of that case, however, that the company involved was not one of these building and loan companies, and hence that decision is hardly controlling here. We may concede, although not deciding, that the proposition is correct in ordinary assignments made by individuals or business corporations, but hold that it does not apply here, to the exclusion of equitable defenses. In the other case (In re Heath's Assignment, 136 Mo. App. 347, l. c. 352, 117 S. W. 125), the Kansas City Court of Appeals held that the proceeding was purely statutory and not equitable. The case there under consideration, however, was the assignment of an individual, and what we have just said of the Universal Lock & Stopper Company case applies to it.

The latter court in Sappington v. Aetna Loan. Co., 76 Mo. App. 242, had itself held that the law merchant

does not apply to these companies. Even in the administration of statutory provisions, equitable rules of procedure are often followed, as for example in divorce proceedings. We remark that even under our statute, and before the amendment by the Act of 1901, which prohibited assignments, the spirit of our law, as shown by the decisions of our own courts and by the courts of other jurisdictions and by an accepted text-writer on the subject, always has been to treat these incorporated building and loan associations more in the nature of partnerships, and in their settlement when bankrupt, either through an assignee or a receiver, to apply the principles of equity pertaining to partnerships, and to settle their affairs according to equity. This is notably so in Pennsylvania, as see Christian's Appeal, 102 Pa. St. 184, l. c. 188. Such is the rule in Massachusetts. Referring to a co-operative bank, an institution which has many of the elements of building and loan associations, when the latter are incorporated under our laws, as is the one here, it is said by the Supreme Judicial Court of Massachusetts, in Atwood v. Dumas, 149 Mass. 167, l. c. 169, that these co-operative institutions seem at first to have appeared as voluntary unincorporated associations and that the incorporation of them "simply facilitates carrying out the purposes for which they are formed: on the one hand, of advancing the funds contributed by the members to such of them as make the best offers; and on the other, of dividing the profits, if any, among the shares." That is very much the character of our incorporated building and loan associations. See also for a description of these associations, Lovelace v. Pratt, 163 Mo. 70, l. c. 75, 63 S. W. 383, quoting approvingly State of Minnesota v. Redwood Falls Building & Loan Association, 45 Minn. 154.

In Endlich on Building Associations (2 Ed.), sec. 364, the author cites Hammerslough v. Kansas City Building, Loan & Savings Association, 79 Mo. 80, as a case which, while not expressly touching upon the ques-

tion as to whether these associations are to be treated as copartnerships, yet as tending to apply to them the character of copartnerships. That author says (section 365) that an examination of the decisions which he has cited would seem to justify the conclusion "that the clear weight of judicial authority declines to look upon the transaction between a building association and its advanced member as constituting a loan pure and simple." At section 366 he says that when the question of the character of loans made between the association and its members comes up, and where the contract of loan is a valid contract, "it is invariably made up of those two essential and nicely balanced elements, that of a loan, and that of a venture with partnership funds, the outcome of which is indeterminate at the time of its inception." Since the decision in the Hammerslough case, supra, our courts have, as we think, fallen in line with what Mr. Endlich holds to be the weight of authority on this question.

Our own court in Reitz v. Hayward, 100 Mo. App. 216, 1. c. 226, 73 S. W. 374, has said, quoting authorities in support of it, "the underlying idea of building and loan associations is mutuality of losses and profits by all shareholders, who are, in a sense, partners, as has been many times decided." So also it is held in Brown v. Arches, 62 Mo. App. 277, 1. c. 292, and Woerheide v. Johnston, 81 Mo. App. 193, 1. c. 197. In this latter case our court adopts the opinion of Judge GANTT in the same case, rendered in the Supreme Court before it had been called to the attention of that court that it was a case not within its jurisdiction. In the opinion of Judge GANTT is this (1. c. 198): "A building and loan association while peculiar in its features is nevertheless a business corporation and when its affairs become so tangled that it can no longer subserve the purposes of its incorporation its affairs may be wound up by a court of equity and its assets marshaled and distri-

buted, but no good reason appears to us why it may not also make an assignment of its assets and under the direction of the court have its assets distributed by an assignee." That is the rule announced by the Supreme Court of Pennsylvania in Christian's Appeal, supra, l. c. 189, where it is said that while the usual method of administering the assets of an insolvent association is through the instrumentality of a receiver, an assignment is equally efficacious. So it is held in the Massachusetts case of Atwood v. Dumas, supra.

The rule that we gather from these decisions is that while under our law as it stood prior to 1901, an assignment by these associations might be made, when the courts undertake to settle questions arising between the note-making member and the company or its assignee, they apply to those questions equitable principles, and practically treat the assignee as a receiver appointed by a court of equity, and determine all matters affecting the member and the corporation not strictly as a statutory proceeding under the assignment law, but as one to which equitable principles are to be applied. So that when, under the provisions of the act of March 6, 1901, assignments by these companies was prohibited and their affairs required to be wound up by a supervisor under direction of the court, it really did no more than to enact into law what had been before then adopted by the courts as the rule even under assignments; that is, recognize the application of equitable rules to the adjustment of their affairs. The appellant himself recognized this in the circuit court, having by his own motion had the cause changed from the law docket of the circuit court to the equity docket.

Considering the defense of laches, we hold appellant's testator was guilty of such laches in the presentation and prosecution of his claim and the omission to promptly take necessary steps to bring it to the attention of the court, as to debar him from now assert-

ing a claim to participation in any declared dividend. He permitted this assignee to distribute the bulk of this assigned estate to those to whom he had allowed claims and who were recognized as entitled to it by the court and those to whom the court ordered it to be distributed. To charge back to the assignee or to the stockholders, who have received more than they otherwise would have received, under the circumstances of the case, would be grossly inequitable as to the assignee, and if we are to attempt to charge it back to those who received their dividends and call on them to refund, it is a sufficient answer to say that they are not before the court.

Turning to the most important point in this case, which is whether with the sale of the notes any right or interest in the stock membership or stock certificates passed to the purchaser, we hold it did not. As stated in the cases before referred to, these building and loan associations are peculiar. They are conducted entirely on the mutual plan. The stockholders are members, not only in the usual sense of stockholders, but are partners with each other; the corporation is in the nature of a co-operative association. Mr. McCormack purchased the notes of certain members, to which the stock of those members was pledged as collateral. It is said that certain real estate, also up as collateral, went with the sale of the notes, and the court ordered a sale of this along with the notes. No question is here made as to the propriety of that order, although it is rather curious, for neither the corporation nor its assignee owned the real estate but merely held and owned unforeclosed mortgages or deeds of trust on the real estate, although it was the real estate covered by the deeds of trust and the shares of stock which were pledged as collateral to the notes. These pieces of real estate, however, that is, the assignee's interest in them, were offered for sale, separate and apart from the notes. The notes were first offered and McCor-

mack bid one hundred dollars for each of them. His bid was not accepted. Then the real estate, not the deeds of trust, was offered and McCormack bid a specific amount for each piece. This bid was not accepted. Thereupon the notes and real estate were offered together and in a lump, and Mr. McCormack's bid for all of the notes and real estate, being slightly higher than his separate bids, was accepted. It does not seem to be claimed here that if any one, other than Mr. McCormack, had bid more than he for the real estate, that McCormack, purchasing the notes, was entitled to the real estate. To the contrary, the action of the parties and of the court seems to show that no one considered that title to the real estate under mortgage, the mortgages also covering the stock, all pledged as collateral to the notes, passed with the sale of the notes. Why then, in the absence of any representations to the effect, and none is pretended, should it be assumed that the sale of the notes carried with it sale of or title to the stock certificates any more than to the real estate? The acts of the parties are pretty clear indications of their understanding.

It is true that under the law merchant, the purchase of a note carries with it its collateral. That law is always applied to negotiable notes as well as non-negotiable. But we do not think that it applies to the notes of these building and loan companies. These notes, if correctly called so, are non-negotiable. It will be remembered that among other provisions in them is the promise to carry the stock until the loan is fully paid, "with all the penalties on said stock, according to the by-laws and prospectus of said company." Under the decision of our Supreme Court in First National Bank of Trenton v. Gay et al., 63 Mo. 33, l. c. 37, like words in a note were held to destroy its character as a negotiable instrument, referring to Ayrey v. Fearnsides, 4 M. & W. 168, where the words employed were to pay "all fines according to rule." Other de-

cisions of our Supreme Court are to the same effect. See, *inter alia*, First National Bank of Carthage v. Marlow, 71 Mo. 618, where it is held that a stipulation to pay attorney's fees rendered the instrument neither a bond, bill of exchange nor promissory note; see also McCoy v. Green, 83 Mo. 626, 1. c. 633.

The statute itself regulating these companies, when providing in what is now section 3392, R. S. 1909, that they are non-negotiable, does no more than put into the statute a construction that had long before been applied by the courts, in holding that notes, given to these companies, are not commercial paper. [See Sappington v. Aetna Loan Co., supra.] By the statute it is provided, that "for every loan or advance made as aforesaid, a non-negotiable note or a bond secured by first mortgage or deed of trust on real estate shall be given, accompanied by a transfer and pledge of the shares of stock of the member or members so obtaining a loan or advance. Said shares so transferred and pledged shall be held by (the) corporation as additional or collateral security for the performance of the agreements, covenants and conditions of said note or bond and mortgage or deed of trust." As we construe this term "non-negotiable," as applied to those building and loan companies, it means non-assignable.

It has always been held by our courts, that these notes themselves, in the hands of the company itself, then a going concern, are not assignable by the corporation. [Lovelace v. Pratt, supra, 1. c. 76.] In Cobe v. Lovan, 193 Mo. 235, 1. c. 242, *et seq.*, 92 S. W. 93, it appears that such a company, then in *articulo mortis*, attempted to sell the notes of its members to another corporation, and our Supreme Court held that it could not do that, although in Pennsylvania it was held that in winding up its affairs, title to the notes and their collateral passed to the assignee. [Early & Lane's Appeal, 89 Pa. St. 411, 1. c. 416.] Hence we hold, following what we understand to be the spirit of our stat-

ute and decisions, that save in the event of the liquidation of one of these companies, when the notes go to the official liquidator or assignee, these notes are not assignable and the assignee had no power to sell them.

It is clear, when we consider the organization of these associations, their purposes, and the whole scheme, that appellant's testator by purchase of these instruments, call them notes for brevity, did not acquire the stock, did not become a stockholder in the defunct corporation and was not entitled to participate in any dividend going to stockholders. On his own theory that he had title to the notes, he took after maturity of these notes and after default, so that even conceding for argument that he could become owner by purchase, he took subject to all equities and could obtain no higher or better rights than the maker of the instrument. It is admitted in the agreed statement that as to none of the makers of the notes, if claiming dividends, would those makers be entitled to a dividend if the notes had not been sold. This admission would seem, of itself, to put appellant out of court.

On all these considerations we hold that the judgment of the circuit court in overruling the motion of appellant's intestate was proper, and that judgment is affirmed. *Nortoni* and *Caulfield, JJ.,* concur, the former in the result.

